UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM E. THOMASAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-CV-1798 NAB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying William Thomason's application for disability insurance benefits and supplemental security income under the Social Security Act. Thomason alleged disability due to fatigue, congestive heart failure, dizziness, and memory loss. (Tr. 206.) The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Doc. 9.] The Court has reviewed the parties' briefs and the entire administrative record, including the hearing transcripts and the medical evidence. The Court heard oral argument in this matter on January 4, 2018. For the reasons set forth below, the Court will reverse and remand the Commissioner's final decision.

**I.  Issues for Review**

Thomason presents several issues for review. First, he states that the Commissioner failed to meet her burden of proof to demonstrate that there are other jobs in the national economy that the claimant can perform. Second, Thomason asserts that the ALJ did not properly consider the opinion evidence from his treating physicians including, Dr. Robert Armbruster, Dr.

Venkata Pante, and Dr. Antonella Quattromani. Third, Thomason states that the ALJ failed to make specific credibility findings regarding his credibility. The Commissioner contends that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed.

## II. Standard of Review

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)1)A), 423(d)1)(A).

The Social Security Administration ("SSA") uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities and meets the durational requirements of the Act. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix of the applicable regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments do not meet or equal a listed impairment, the SSA determines the claimant's Residual Functional Capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant meets this burden, the analysis proceeds to step five. At step five, the burden shifts to the

2

Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs in the national economy. *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfied all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The standard of review is narrow. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court reviews the decision of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). The court determines whether evidence is substantial by considering evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006). The Court may not reverse just because substantial evidence exists that would support a contrary outcome or because the Court would have decided the case differently. *Id.* If, after reviewing the record as a whole, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's finding, the Commissioner's decision must be affirmed. *Masterson v. Barnhart*, 363 F.3d 731, 726 (8th Cir. 2004). The Court must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole. *Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 729 (8th Cir. 2003).

### III. Discussion

#### A. Thomason's Medical History

Thomason had a massive heart attack in July 2012. He had thirteen minutes of tachycardia[1], followed by nine minutes of flat lined echocardiogram (EKG), and was hospitalized for 21 days. (Tr. 340.) Doctors performed a five-way cardiac bypass and he received a pacemaker defibrillator. (Tr. 32-33, 340.) Dr. Antonella Quattromani was Thomason's initial treating cardiologist between 2012 and 2015. (Tr. 303-313, 315-327, 329-31, 348-60, 482-84.) During her treatment of Thomason, Dr. Quattromani diagnosed Thomason with cardiomyopathy- ischemic[2], cardiomyopathy-primary, generalized osteoarthritis, history of myocardial infarction and sudden cardiac death. In February 2013, his ejection fraction[3] was 35%. (Tr. 303-304.) During this time, Thomason's heart condition was stable. (Tr. 303, 306, 349.) He complained about joint pain in his shoulder, knees, ankles, and elbows in August and October 2013. (Tr. 308-309, 320.) Thomason returned to work after his heart attack in 2012 and worked until 2014. (Tr. 38.)

During a visit with Dr. Fredric Prater in June 2014, Thomason complained of numbness and tingling. (Tr. 420.)

---

[1] Tachycardia is "excessive rapidity in the action of the heart; term is usually applied to a heart rate above 100 beats per minute in an adult." *Dorland's Illustrated Medical Dictionary* 1867 (32nd ed. 2012).
[2] Ischemic cardiomyopathy is the "name given to heart failure with left ventricular dilation resulting from ischemic heart disease, does not meet strict definition of cardiomyopathy." *Dorland's Illustrated Medical Dictionary* 294 (32nd ed. 2012).
[3] Ejection fraction is "the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole; … It is normally 65 ± 8; lower values indicate ventricular dysfunction." *Dorland's Illustrated Medical Dictionary* 740 (32nd ed. 2012).

In November 2015, Thomason complained of left-sided facial numbness and whole body numbness. (Tr. 405.) On November 13, 2015, a Carotid Duplex Bilateral[4] ultrasound showed that there was "likely 99% stenosis of the left internal carotid artery origin with minimal flow." The ultrasound also showed 70-80% stenosis right internal carotid artery origin." (Tr. 410.) Thomason was admitted to the hospital on November 23, 2015 due to bilateral carotid artery stenosis with 99% on the left and 70-80% on the right, uncontrolled diabetes mellitus type 2, history of coronary artery disease, history of pacemaker placement, and history of congestive heart failure. (Tr. 399.) On that same date, Dr. Gordon Knight performed a left carotid endarterectomy[5] and Thomason was hospitalized for three days. (Tr. 399, 504.) Dr. Knight performed a right carotid endarterectomy on December 9, 2015 and Thomason was hospitalized for 2 days. (Tr. 394, 504.)

In December 2015, Thomason established care with primary care doctor, Dr. Venkata Pante. (Tr. 443-44.) Dr. Pante diagnosed Thomason with Type 2 diabetes, peripheral vascular disease, and hyperlipidemia,[6] cardiomyopathy, and chronic sinusitis. (Tr. 442, 444, 497.) In February 2016, Dr. Pante noted that Thomason's ejection fraction was 30%. (Tr. 442.)

Thomason begin treatment with cardiologist, Dr. Robert Armbruster in November 2015. On February 12, 2016, Thomason visited Dr. Armbruster with complaints of increased dyspnea on exertion and fatigue for six weeks, but stated he was "doing alright" overall. (Tr. 458.) Dr. Armbruster noted that Thomason had "clear worsening of exercise tolerance." Dr. Armbruster ordered a nuclear stress test. (Tr. 459.) The Myocardial Perfusion Stress/Rest Study showed

---

[4] Carotid duplex scanning is "a non-invasive, ultrasound test used to directly detect occlusive disease of the vertebral and extracranial carotid artery." Pagana, et al., Mosby's Manual of Diagnostic and Laboratory Tests 874 (5th ed. 2014).
[5] Carotid endarterectomy is an excision of the thickened, atheromatous tunica intima of the carotid artery, done to prevent a stroke. *Dorland's Illustrated Medical Dictionary* 616 (32nd ed. 2012).
[6] Hyperlipidemia is "a general term for elevated concentrations of any or all of the lipids in the plasma." *Dorland's Illustrated Medical Dictionary* 891 (32nd ed. 2012).

5

that myocardial perfusion was abnormal with left ventricular ejection fraction of 37%. (Tr. 455-56.) On February 22, 2016, Dr. Kausar Nazir performed a left heart catherization[7], selective coronary angiography, selective bypass graft angiography, and percutaneous coronary intervention. (Tr. 449.) Thomason's discharge diagnoses included coronary artery disease, status post cardiac catherization, and percutaneous coronary intervention. (Tr. 449.) In March 2016, Thomason reported to Dr. Armbruster that he "feels great" and that his activity level was markedly increased two weeks after the surgery. (Tr. 446.) Thomason also reported that he was not experiencing any chest pain, shortness of breath, palpitations, lightheadedness, syncope, claudication or shocks from his device. (Tr. 446.) In May 2016, Thomas reported to Dr. Armbruster that he was "doing well" overall and his exercise and dyspnea with exertion had improved. (Tr. 506.)

### B. Opinion Evidence

Thomason contends that the ALJ improperly discounted the weight of his treating physicians' opinions. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, and what the claimant can still do despite her impairments and her physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2)[8]. All medical opinions, whether by treating or consultative examiners are weighed based on (1) whether the provider examined the claimant; (2) whether the provider is a treating source; (3) length of treatment relationship and frequency of examination, including nature and extent of the treatment relationship; (4) supportability of opinion with medical signs,

---

[7] Cardiac catherization is the insertion of a small catheter through a vein in an arm or leg or the neck and into the heart. *Dorland's Illustrated Medical Dictionary* 307 (32nd ed. 2012).
[8] Many Social Security regulations were amended effective March 27, 2017. Per 20 C.F.R. § 404.1527, the court will use the regulations in effect at the time that this claim was filed.

laboratory findings, and explanation; (5) consistency with the record as a whole; (6) specialization; and (7) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000).

### 1. Dr. Antonella Quattromani

On April 22, 2014, Dr. Quattromani, a cardiologist, completed a Medical Source Statement (MSS) for Thomason. (Tr. 329-31.) In the MSS, Dr. Quattromani noted that Thomas had been diagnosed with hypertension, back pain, myocardial infarction, sudden cardiac death, hyperlipidemia, severe left ventricle (LV) dysfunction, congestive heart failure (CHF), and degenerative joint disease in the shoulder and knees. (Tr. 329.) She noted that his treatment included a bi-ventricular implantable cardioverter defibrillator and his side effects included that he may be defibrillated and experience fatigue, dizziness, low blood pressure. (Tr. 329.) Dr. Quattromani noted Thomason met the requirements for the New York Heart Association's (NYHA) Functional Classification III[9]- which indicates marked limitation of physical activity,

---

[9] "The New York Heart Association functional classification system is used by physicians to assess a patient's state of heart failure." *Brawders v. Astrue*, 793 F.Supp.2d 485, 493 (D. Mass. 2011).

7

comfortable at rest, less than ordinary activity causes fatigue, palpitation, or dyspnea. (Tr. 329.) She noted that the side effects from the defibrillator and his medications included being defibrillated, fatigue, dizziness, low blood pressure, hypotension, electrolyte abnormalities. (Tr. 329.) Dr. Quattromani opined that Thomason could frequently lift and carry 10 pounds or less and never fifty pounds. (Tr. 330.) She also opined that Thomason could frequently twist and balance, rarely stoop, and never crouch, crawl, or climb. (Tr. 330.) She also opined that he could sit and stand 30 minutes at a time and sit for two hours and stand for less than two hours in an eight hour work day. (Tr. 330.) Dr. Quattromani opined that Thomason needed to shift positions at will from sitting, standing, or walking; needed to take unscheduled breaks every 2 hours for 15 minutes due to shortness of breath. (Tr. 330-31.) She indicated that he needed to elevate his legs with a prolonged sit or stand for 30% of the work day due to fatigue and swelling. (Tr. 331.) She estimated that he would be off task 15% of the time and would miss work 4 days per month because of his condition. (Tr. 331.) She stated that he was capable of low stress work and would have good and bad days. (Tr. 331.) The ALJ found that there was no explanation for Dr. Quattromani's opinion that Thomason would miss four or more days of work of month. (Tr. 18.) The ALJ gave little weight to Dr. Quattromani's opinion, because it was completed prior to the cardiac interventions. (Tr. 19.)

The Court finds that the ALJ erred in giving little weight to Dr. Quattormani's opinion. Dr. Quattormani's indicated the basis for her opinion, which were Thomason's medical diagnoses and objective medical testing. (Tr. 329.) Further, Thomason had had medical interventions before seeing Dr. Quattromani, because he had a massive heart attack and installation of a defibrillator before she treated him. She also treated him after the alleged onset

date of disability. Dr. Quattormani's opinion is not inconsistent with the other objective medical evidence. Therefore, the ALJ improperly gave little weight to her opinion.

　　　　2.　　**Dr. Robert Armbruster**

Dr. Armbruster, a cardiologist, completed a medical statement regarding Thomason on March 14, 2016. (Tr. 438.) Dr. Armbruster indicated that Thomason had fatigue on exertion and dyspnea on mild exercise. (Tr. 438.) Dr. Armbruster opined that Thomason could work four hours per day, stand and sit for 30 minutes at a time, he could lift less than 50 pounds on an occasional and frequent basis, and he occasionally needs to elevate his legs during an 8 hour workday. (Tr. 438.) Dr. Armbruster included information about Thomason's stress test and cardiac procedures. (Tr. 438.) The ALJ gave Dr. Armbruster's opinion little weight, because he found that Dr. Armbruster's was inconsistent with this treatment notes stating that Thomason was feeling great and his activity had markedly increased. (Tr. 19.) The ALJ noted that the record does not show Thomason needed any extensive cardiac rehab after his procedures. (Tr. 19.)

The Court finds these reasons were insufficient to discount Dr. Armbruster's opinion. Records indicating that a claimant, recovering from several heart surgeries over a short period of time, feels better does not mean that he has the RFC to work a full-time job. Thomason's statements that he was feeling better and his activity had improved is not inconsistent with an inability to work. "It is possible for a person's health to improve, and for the person to remain too disabled to work." *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003). "[D]oing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity." *Hutshell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001). *See e.g., Gude v. Sullivan*, 956 F.2d 791, 794 (8th Cir. 1992) (claimant doing well for

9

someone with systemic lupus erythematosus and it does not contradict doctor's opinion on her inability to work); *Fleshman v. Sullivan*, 933 F.2d 674, 676 (8th Cir. 1991) (A person who has undergone a kidney transplant may indeed "feel better" than she did when she was undergoing dialysis, but that does not compel the conclusion that she was therefore able to work). To determine whether a claimant has the residual functional capacity necessary to be able to work the Court looks to whether he has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004) (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). In his treatment notes, Dr. Armbruster was not assessing Thomason's ability to work, but his recovery from heart surgery. Dr. Armbruster cited objective medical testing to support his opinion, which other than the 50 pound weight limit, is not contradicted by other evidence in the record. Therefore, the ALJ improperly discounted Dr. Armbruster's opinion.

### 3. Dr. Venkata Pante

Dr. Venkata Pante treated Thomason as his primary care physician managing his type 2 diabetes. (Tr. 440-45, 496-500.) The record shows treatment notes from December 2015 to May 2016. Dr. Pante completed a medical source statement in March 2016. (Tr. 433-35.) In the opinion, Dr. Pante noted that Thomason's diagnoses included coronary artery disease, cardiomyopathy, peripheral vascular disease, hypertension, and an AICD pacer. (Tr. 433.) Thomason's symptoms were fatigue at times, neuropathy pain, and dyspnea with occasional pain (Tr. 433.) Dr. Pante opined that Thomason could lift and carry less than 10 pounds frequently occasionally balance and crouch. (Tr. 434.) She also opined that he could sit and stand for 30 minutes at a time for up to two hours during an eight hour work day. (Tr. 434.) She also

10

indicated that he would need to shift positions at will. (Tr. 434.) She also opined that Thomason would need to take unscheduled breaks during the work day every two to three hours for twenty minutes due to pain and chronic fatigue. (Tr. 435.) She also stated that he would need to elevate his leg thirty degrees for 20-30 minutes due to swelling. (Tr. 435.) Dr. Pante opined that Thomason would be off task 25% of the time and was capable of low stress work. (Tr. 435.) She opined that his impairments would likely to produce good and bad days and he would likely miss or leave work early more than four days per month. (Tr. 435.)

The ALJ gave Dr. Pante's opinions little weight, because he found that (1) Dr. Pante was treating Thomason for uncomplicated diabetes, (2) his treatment notes only found decreased sensation in the lower extremities with no mention of a loss of strength function or atrophy. The ALJ opined that Dr. Pante's treatment notes were not supported by his actual treatment notes which amounted to a series of routine diabetes check-ups. The Court finds that the ALJ improperly discounted Dr. Pante's medical opinion. Most significantly, Dr. Pante's opinion is very consistent with Dr. Armbruster and Dr. Quattromani's opinions regarding: (1) the need for leg elevation, (2) the need to shift positions at will, (3) four days or more per month to miss work because of condition, and (4) the ability to do low stress work. Although Dr. Pante treated Thomason for diabetes, his opinion should be given some weight because his opinion is consistent with the treating specialists' opinions and with the record as a whole. Therefore, the ALJ's weighing of Dr. Pante's opinion is not supported by substantial evidence.

C. **Vocational Expert Testimony and Credibility**

Next, Thomason contends that the ALJ committed reversible error because the ALJ did not allow his counsel to cross examine the vocational expert regarding the basis for the number of jobs provided in his testimony. Thomason also states that the ALJ failed to make any specific

credibility findings. Because the Court has reversed for the reasons stated above, the Court will not address the vocational expert issue and credibility issue, which may be affected by the reconsideration of the other issues addressed herein.

## IV. Conclusion

Based on the foregoing, the undersigned finds that the Commissioner's final decision was not supported by substantial evidence in the record. Therefore, the Court will reverse and remand this action for further proceedings consistent with this memorandum and order.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in his Complaint and Brief in Support of Plaintiff's Complaint is **GRANTED in part and DENIED in part**. [Docs. 1, 16.]

**IT IS FURTHER ORDERED** that the Commissioner's decision of August 18, 2016 is **REVERSED** and **REMANDED** to re-evaluate the weight given to the medical opinions of Plaintiff's treating physicians.

**IT IS FURTHER ORDERED** that a Judgment will be filed contemporaneously with this Memorandum and Order remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

Dated this 20th day of March, 2018.

    /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE